IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) THE KIAMICHI RIVER LEGACY ALLIANCE, INC., an Oklahoma Not for Profit Corporation; <br> (2) KENNETH ROBERTS, an individual; <br> (3) DANIEL ROBERTS, an individual; <br> (4) DALE JACKSON, an individual; <br> (5) JUSTIN JACKSON, an individual; <br> (6) KREY LONG, an individual; <br> (7) JOHNNY ROBBINS, an individual; <br> (8) WELDON ROBBINS, an individual; <br> (9) WILLIAM REDMAN, an individual; <br> (10) MYRL REDMAN, as an individual and as Trustee of THE LOUISE A. REDMAN REVOCABLE TRUST, <br><br>            Plaintiffs, <br><br> vs. <br><br> (1) DAVID BERNHARDT, in his official capacity as acting Secretary of the United States Department of the Interior; <br> (2) KEVIN STITT, in his official capacity as Governor of the State of Oklahoma; <br> (3) BILL ANOATUBBY, in his official capacity as Governor of the Chickasaw Nation; <br> (4) GARY BATTON, in his official capacity as Chief of the Choctaw Nation of Oklahoma; <br> (5) DAVID HOLT, in his official capacity as Mayor of the City of Oklahoma City; <br> (6) JULIE CUNNINGHAM, in her official capacity as Executive Director of the Oklahoma Water Resources Board; <br> (7) CARL EDWARDS, in his official capacity as Chairman of the Board of Trustees of the Oklahoma City Water Utilities Trust, <br><br>            Defendants. | Case No.   19-CV-108-RAW |

# COMPLAINT

1

COME NOW the Plaintiffs and for their causes of action against the Defendants, allege and state as follows:

## I. Background

### A. The Endangered Mussels of the Kiamichi River Basin

1. The Kiamichi River flows in and through southeast Oklahoma. Its headwaters are in LeFlore County, then it flows west and south through Pushmataha and Choctaw counties. These river waters are inhabited by two (2) federally designated endangered species of mussels: the Ouachita rock pocketbook (*Arcidens (Arkansia) wheeleri*), and the scaleshell (*Leptodea leptodon*) A third endangered mussel species that is likely also inhabiting the Kiamichi River, the winged mapleleaf (*Quadrula fragosa*), has also been reported to inhabit the River, but its current status there is uncertain. (All three of these mussel species collectively referred to herein as the "Endangered Mussels").

2. These Endangered Mussels are only able to inhabit flowing water systems (streams) of a certain size, with seasonal changes and permanence of living conditions.

3. The Endangered Mussels are freshwater mussel species that are members of an unusually diverse, productive mussel community inhabiting the Kiamichi River, which also supports a high diversity of other native aquatic species.

4. These Endangered Mussels have experienced extensive reductions in their historical habitat ranges, and for each, the Kiamichi River is one of relatively few streams that support surviving populations.

5. In the case of *Arcidens (Arkansia) wheeleri*, the Kiamichi River supports the only remaining viable population in the world.

6. Overall, mussel populations in the Kiamichi River have declined by 60% over the last 25 years.

## B. The Settlement Agreement

7. The State of Oklahoma, Choctaw Nation of Oklahoma, Chickasaw Nation, and City of Oklahoma City Water Settlement of August 2016 (the "Settlement Agreement") was entered into, and approved by: the Secretary of the United States Department of the Interior (then Sally Jewell); the Governor of the State of Oklahoma (then Mary Fallin); the Attorney General of the State of Oklahoma (then E. Scott Pruitt); the Governor of the Chickasaw Nation, Bill Anoatubby; the Chief of the Choctaw Nation of Oklahoma, Gary Batton; the Chairman of the Oklahoma Water Resources Board (then Linda Lambert); the Vice Mayor of the City of Oklahoma City (then James Greiner); and the Vice Chairman of the Oklahoma City Water Utilities Trust, Carl E. Edwards, Jr. (now Chairman), in late 2016.

8. The Settlement Agreement facilitated the issuance of a permit (the "Permit") by the Oklahoma Water Resources Board ("OWRB") to appropriate water from the Kiamichi River Basin, specifically the Kiamichi River and the Sardis Lake Reservoir.

9. On January 11, 2017, the City of Oklahoma City filed its Second Amended Application by the City of Oklahoma City to the OWRB for a Permit to Use Surface Water ("Application for Permit") seeking to appropriate water from the Kiamichi River and Sardis Lake Reservoir via a diversion in the general vicinity of Moyers Crossing, in Pushmataha County. The water would then be transported by pipeline to Oklahoma City for use and/or sale.

10. The Kiamichi River Legacy Alliance and some of its members objected to the Application for Permit based on the harm that the appropriation will cause to freshwater species listed as endangered under the ESA, including the Endangered Mussels.

11. On October 10, 2017, the OWRB approved the Application for Permit and issued an Order approving the Permit.

## II. Parties, Jurisdiction, and Venue

12. Plaintiff The Kiamichi River Legacy Alliance, is an Oklahoma Not-for-Profit Corporation. The members of The Kiamichi River Legacy Alliance use and enjoy the Kiamichi River, the surrounding land, and its associated waterways, for aesthetic, educational, cultural, and recreational purposes. Individual members of The Kiamichi River Legacy Alliance observe and enjoy the presence of the Endangered Mussels in the Kiamichi River, freshwater species listed as endangered under the Endangered Species Act ("ESA"), **16 U.S.C. § 1531**, et seq. The Kiamichi River Legacy Alliance also funds and/or otherwise supports such endangered freshwater species in order to preserve the natural ecology of the Kiamichi River.

13. Plaintiff Dr. Kenneth Roberts is the President, founder, and a member of The Kiamichi River Legacy Alliance. He owns property on the Kiamichi River (including a cabin) and he enjoys and uses the Kiamichi River for recreational, educational, cultural, and aesthetic purposes.

14. Plaintiff Daniel Roberts is an individual and a member of The Kiamichi River Legacy Alliance. He owns property on the Kiamichi River (including a cabin) and he enjoys and uses the Kiamichi River for recreational, educational, cultural, and aesthetic purposes.

15. Plaintiff Dale Jackson is an individual residing in Pushmataha County, whose residence and land borders the Kiamichi River. He uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways, for aesthetic, educational, cultural, and recreational purposes. He has an economic interest in clean water flowing in, and the natural ecology of, the Kiamichi River, with respect to his ranching, and hunting and fishing guide businesses. He is also a member of The Kiamichi River Legacy Alliance.

16. Plaintiff Justin Jackson is an individual residing in Pushmataha County, whose residence and land borders the Kiamichi River. He uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways, for aesthetic, educational, cultural, and recreational purposes. He has an economic interest in clean water flowing in, and the natural ecology of, the Kiamichi River, with respect to his ranching, and hunting and fishing guide businesses. He is also a member and Vice President of The Kiamichi River Legacy Alliance.

17. Plaintiff Krey Long is an individual residing in Pushmataha County, whose land and residence borders the Kiamichi River. She uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways for aesthetic, educational, cultural, and recreational purposes. She is also a member of The Kiamichi River Legacy Alliance.

18. Plaintiff Johnny Robbins is an individual residing in Pushmataha County, whose land and residence borders the Kiamichi River. He uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways, for aesthetic, educational, cultural, and recreational purposes.  He is also a member of The Kiamichi River Legacy Alliance.

19. Plaintiff Weldon Robbins is an individual residing in Pushmataha County whose residence and land borders the Kiamichi River. He uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways, including Sardis Lake Reservoir, for aesthetic, educational, cultural, and recreational purposes.  He is also a member of The Kiamichi River Legacy Alliance.

20. Plaintiff William Redman is an individual who is a beneficiary of the Louise V. Redman Revocable Trust. The Trust owns land bordering the Kiamichi River. He uses and enjoys the Kiamichi River, the surrounding land, and its associated waterways, for aesthetic, educational,

cultural and recreational purposes. He is also a member and the Secretary of The Kiamichi River Legacy Alliance.

21. Plaintiff Myrl Redman is an individual who is the Trustee and beneficiary of The Louise A. Redman Revocable Trust. The Trust is organized under the laws of Oklahoma, and has as a trust asset land which borders the Kiamichi River. The beneficiaries of the Trust use and enjoy the Kiamichi River, the surrounding land, and its associated waterways for aesthetic, educational, cultural, and recreational purposes.

22. Defendant David Bernhardt is sued in his official capacity as acting Secretary of the United States Department of the Interior. The Department of the Interior, as Trustee of the Chickasaw Nation and the Choctaw Nation of Oklahoma, had to approve the Settlement Agreement for it to be valid and effective. The United States Department of the Interior approved the Settlement Agreement. The Settlement Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir and it facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. As a federal agency, the United States Department of the Interior must comply with federal law, including the ESA.

23. Defendant David Stitt is sued in his official capacity as Governor of the State of Oklahoma. The State of Oklahoma was a party to the Settlement Agreement. The Settlement Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir, and it facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. States, their subdivisions, and their agencies must comply with federal law, including the ESA.

24. Defendant Bill Anoatubby is sued in his official capacity as Governor of the Chickasaw Nation. The Chickasaw Nation was a party to the Settlement Agreement. The Settlement

6

Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir and it facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. The Chickasaw Nation must comply with the ESA.

25. Defendant Gary Batton is sued in his official capacity as Chief of the Choctaw Nation of Oklahoma. The Choctaw Nation of Oklahoma was a party to the Settlement Agreement. The Settlement Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir, and it facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. The Choctaw Nation must comply with the ESA.

26. Defendant David Holt is sued in his official capacity as Mayor of the City of Oklahoma City. The City of Oklahoma City was a party to the Settlement Agreement. The Settlement Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir, and it facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. The City of Oklahoma City is a subdivision of the State of Oklahoma. States, their subdivisions, and their agencies must comply with federal law, including the ESA.

27. Defendant Julie Cunningham is sued in her official capacity as Executive Director of the OWRB. The OWRB granted the Permit to appropriate water from the Kiamichi River Basin. The OWRB is an agency of the State of Oklahoma. States, their subdivisions, and their agencies must comply with federal law, including the ESA.

28. Defendant Carl Edwards is sued in his official capacity as Chairman of the Board of Trustees of the Oklahoma City Water Utilities Trust. The Oklahoma City Water Utilities Trust was a party to the Settlement Agreement. The Settlement Agreement allows for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir, and facilitated the approval of the Permit to appropriate water from the Kiamichi River Basin. The Oklahoma City

Water Utilities Trust is a subdivision of the State of Oklahoma. States, their subdivisions, and their agencies must comply with federal law, including the ESA.

29.     Defendants' actions in agreeing to the Settlement Agreement allow for diversion and withdrawal of water from the Kiamichi River and the Sardis Lake Reservoir. Their actions facilitated the approval and the issuance of the Permit. These actions, which will appropriate the waters of the Kiamichi River and the Sardis Lake Reservoir, make it reasonably certain that the instream flow of water will be reduced to a level that will jeopardize the continued existence of the Endangered Mussels. These actions will also cause a taking due to the ensuing harassment and harm to the Endangered Mussels and the adverse modification of the habitat of the Endangered Mussels.

30.     Jeopardizing the continued existence of the Endangered Mussels and the taking of the Endangered Mussels are concrete and actual injuries to Plaintiffs' interests.

31.     An order from this Court requiring Defendants to comply with the substantive and procedural mandates of the ESA would protect Plaintiffs' interests in the Endangered Mussels and redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law.

32.     Jurisdiction is afforded to this Court pursuant to the citizen suit provision of the ESA, **16 U.S.C. § 1540(g)(1)**, which provides that the "district courts shall have jurisdiction . . . to enforce any such provision or regulation" of the ESA. Jurisdiction is also conferred over this action by **28 U.S.C. § 1331** (federal question jurisdiction), **28 U.S.C. § 2201** (declaratory judgment), and **28 U.S.C. § 2202** (injunctive relief).

33.     As required under the ESA, Plaintiffs provided a 60-day notice of their intent to sue Defendants on December 19, 2018. A copy of this letter is appended as Exhibit "1". Defendants have not remedied the violations described in this 60-day notice letter. **16 U.S.C. § 1540(g)(2)(A)**.

8

34. The United States, its officers and agencies, have not commenced, and are not prosecuting, any action against Defendants to redress Defendants' violations of the ESA. **16 U.S.C. § 1540(g)(2)(A)**.

35. Venue is proper in this judicial district under **28 U.S.C. § 1391(b)(2) and (3)** and **16 U.S.C. § 1540(g)(3)(A)**. The Kiamichi River Basin and the Endangered Mussels are located in this district and a substantial part of the actions and violations of the ESA occur in this district.

### III. Plaintiffs' Claims

#### A. ESA Section 7(a)(2) Violation

36. Plaintiffs restate and incorporate the allegations of Paragraphs 1-35, above, as though fully restated herein.

37. When a species is listed as threatened or endangered under the ESA, section 7(a)(2) of the ESA requires that all federal agencies "insure" that their actions "[are] not likely to jeopardize the continued existence of any endangered species or threatened species." **16 U.S.C. § 1536(a)(2)**.

38. The ESA establishes an interagency consultation process to assist federal agencies in complying with their substantive section 7(a)(2) duty to guard against jeopardy to listed endangered species. Under section 7(a)(2) federal agencies must consult with the appropriate expert fish and wildlife agency to determine whether their actions will jeopardize any listed species' survival and, if so, to identify ways to modify the action to avoid that result. *See* **50 C.F.R. § 402.14**. The U.S. Fish and Wildlife Service ("FWS") is the expert agency with respect to most terrestrial and freshwater species including the Endangered Mussels.

39. The expert agencies have adopted joint regulations governing the section 7(a)(2) consultation process. Under the joint regulations, a federal agency must initiate a section 7(a)(2) consultation with the FWS whenever it undertakes an "action" that "may affect" a listed species or

critical habitat. **50 C.F.R. § 402.14(a)**. The threshold for a "may affect" finding and the required ESA section 7(a)(2) consultation is low. *See* **51 Fed. Reg. 19,926, 19,949** (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."). *See also* Endangered Species Act section 7 Consultation Handbook at 3-13, 4-26. An agency is relieved of the obligation to consult only if the action will have "no effect" on listed species.

40. The joint regulations also broadly define the scope of agency actions subject to ESA. Section 7(a)(2) mandates encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by [f]ederal agencies," including the promulgation of regulations and the granting of licenses. *See* **50 C.F.R. § 402.02** (definition of "action"). Courts interpret the term "agency action" broadly under the ESA.

41. Under the ESA, the "action area" is broadly defined as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." **50 C.F.R. § 402.02**. The potential "effects" of an agency action that an agency must consider are similarly broad and include both the "direct" and "indirect" effects of the action and all activities interrelated or interdependent with that action.

42. If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species, ESA regulations permit "informal consultation," in which there is no requirement for a biological opinion so long as the expert agency, here the FWS, concurs in writing with the "not likely to adversely affect" determination. **50 C.F.R. § 402.13**. If the expert agency (FWS) does not concur in the "not likely to adversely affect" determination, or if the action agency determines that the action is "likely to adversely affect" the listed species, the agencies must engage in "formal consultation." **50 C.F.R. §§ 402.02, 402.14(a), (b)**.

43. Formal consultation "is a process between the Service [here the FWS] and the [f]ederal agency that commences with the [f]ederal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act." **50 C.F.R. § 402.02**.

44. Compliance with the procedural provisions of the ESA—employing the process of identifying the likely effects of the action through the consultation process—is integral to compliance with the substantive requirements of the ESA. Under the statutory framework, federal actions that "may affect" a listed species may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy to a listed species. **16 U.S.C. § 1536(a)**; **50 C.F.R. §§ 402.14, 402.13**; *see also* **16 U.S.C. § 1536(d)**.

45. Approval of the Settlement Agreement by the Secretary of the United States Department of the Interior constitutes federal agency action authorizing the appropriation of water from the Kiamichi River Basin.

46. Federal agency action will be needed to carry out the appropriation authorized in the Permit.

47. On April 10, 2017, approximately three months after the City of Oklahoma City filed its Application for Permit, the FWS sent a letter to the City of Oklahoma City. (*attached hereto as Exhibit "2"*). The letter requested that the OWRB not approve the Application for Permit, and stated that FWS had no records indicating the City had submitted the Application for Permit to the FWS's online project review process in order to address potential take of listed species posed by the permit, and that parts of the project involved federal action. There is no mention of any consultation pursuant to ESA, section 7(a)(2). Indeed, the FWS letter specifically expressed

concern regarding several species of endangered mussels, including the Endangered Mussels. The FWS letter expressed concern regarding the *multiple significant environmental effects on native species and habitats that are protected as federal trust resources* as a result of the water appropriations approved by the Settlement Agreement and requested in the Application for Permit. (*Exhibit 2, p.1*). Therefore, a formal consultation under the ESA was required, but did not occur.

48. None of the Defendants consulted with FWS concerning the effect of the Settlement Agreement or the Permit on the Endangered Mussels.

49. As such, the United States Department of the Interior violated the agency's Section 7 duty to ensure that its actions avoid adverse effects to the continued existence of any endangered species or threatened species.

50. The United States Department of the Interior has not completed the consultation process and received a valid biological opinion, yet it approved the Settlement Agreement. This violates the Agency's duty to avoid adverse effects to the continued existence of the Endangered Mussels.

51. Section 7 analysis will also be required because there would be major construction at the diversion points which would require a Department of Army Permit issued under Section 404 of the Clean Water Act, which would also be an agency action.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

A. Declare that the United States Department of the Interior is in violation of section 7(a)(2) of the ESA, **16 U.S.C. § 1536(a)(2)**, by failing to complete consultation to ensure that its approval and implementation of the Settlement Agreement is not likely to jeopardize the continued existence of Endangered Mussels;

B. Enjoin the United States Department of the Interior from allowing the appropriation of water from the Kiamichi River Basin in violation of the ESA and to avoid or remediate harm to the Endangered Mussels until such time as consultation is complete and the United States Department of the Interior and the Department has implemented, or ensured implementation of, the permanent measures necessary to ensure against jeopardy to the continued existence of the Endangered Mussels;

C. Award Plaintiffs their attorneys' fees and costs in this action pursuant to **16 U.S.C. § 1540(g)(4)** and **28 U.S.C. § 2412**; and

D. Grant such other and further relief as Plaintiffs may request and as the Court deems just and proper.

**B.     ESA Section 9 Violation**

52.     Plaintiffs restate and incorporate the allegations of Paragraphs 1-51, above, as though fully restated herein.

53.     The ESA and its regulations prohibit the "take" of listed endangered or threatened species. **16 U.S.C. §1538(a)(1)**. The term "person" means any "individual […] or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State […] or any other entity subject to the jurisdiction of the United States." **16 U.S.C. § 1532(13)**. The term "take" is broadly defined to include actions that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or […] attempt to engage in such conduct." **16 U.S.C. § 1532(19)**. Harm is further defined to include significant habitat modification or degradation that kills or injures a listed species by significantly impairing essential behavioral patterns, including breeding, rearing, migrating, feeding, or sheltering. **50 C.F.R. § 17.3.**

54. The ESA "not only prohibits the acts of those parties that directly exact the taking, but also bans those acts of a third party that bring about the acts exacting a taking[.]" ***Strahan v. Coxe, et al.***, 127 F.3d 155 (1st Cir. 1997); **16 U.S.C. § 1538(g)**. A governmental third party pursuant to whose authority an actor directly exacts a taking of a protected species may be deemed to have violated the ESA prohibition against taking protected species. ***Id.***

55. It is only legally permitted to "take" protected species in very limited circumstances closely regulated by the Federal agencies. The United States Department of the Interior, through FWS may issue incidental take permits ("ITP") sanctioning the taking of a protected species where such taking is "incidental to, and not the purpose of, carrying out of an otherwise lawful activity." **16 U.S.C § 1539(a)(1)(B)**. Unless a particular actor has been properly exempted in accordance with this section, any incidental take of protected species is unlawful and in violation of the ESA. No such ITP exists for taking the Endangered Mussels as a result of the appropriation of water from the Kiamichi River and the Sardis Lake Reservoir pursuant to the Settlement Agreement or the Permit.

56. The Endangered Mussels are listed as an endangered species under the ESA.

57. The Kiamichi River is the habitat of the Endangered Mussels.

58. The plan to be implemented under the Settlement Agreement and the Permit are such that they will significantly impact the endangered mussels' habitat which will kill, harm and harass these species as defined by the ESA and its regulations. Changes in water levels at critical periods in the Endangered Mussels' life cycle negatively affects the species. These effects fall within the definition of "take" prohibited by the ESA.

59. The United States Department of the Interior's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

60. The State of Oklahoma's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

61. The Chickasaw Nation's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

62. The Choctaw Nation of Oklahoma's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

63. The City of Oklahoma City's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**. The City of Oklahoma City also violated Section 9 of the ESA by making clear its intent, in the Application for Permit, to appropriate water from the Kiamichi River and the Sardis Lake Reservoir, and obtaining the Permit to appropriate such water.

64. The Oklahoma City Water Utilities Trust's approval of the Settlement Agreement violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

65. The OWRB's approval of the Application for Permit and issuance of the Permit to the City of Oklahoma City to appropriate the waters of the Kiamichi River Basin violates ESA Section 9, and is actionable under the ESA citizen suit provision. **16 U.S.C. §§ 1538, 1540(g)**.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that the Court:

A. Declare that the Defendants are in violation of section 9 of the ESA, **16 U.S.C. §1538(a)(1)**, by causing a taking of the Endangered Mussels;

B. Enjoin Defendants from appropriating, or taking steps toward appropriating, water from the Kiamichi River Basin until a plan has been developed which does not constitute a taking under the ESA;

C. Award Plaintiffs their attorneys' fees and costs in this action pursuant to **16 U.S.C. § 1540(g)(4)** and **28 U.S.C. § 2412**; and

D. Grant such other and further relief as Plaintiffs may request and as the Court deems just and proper.

Respectfully submitted,

**BARBER & BARTZ**

*/s/David P. Page*
David P. Page, OBA #6852
Maria Luckert OBA # 32823
(Pending Admission to the Eastern District of Oklahoma)
525 S. Main Street, Suite 800
Tulsa, Oklahoma 74105
Telephone: (918)599-7755
Facsimile: (918)599-7756
Email: dpage@barberbartz.com
***Attorneys for Plaintiffs***